The United States v. Hi-Tech. Mr. Nieman. Thank you, Judge Choflat. May it please the Court. My name is John Nieman. I'm here representing Hi-Tech. This is a case about the rules that the FDA is required to follow under the Food, Drug, and Cosmetic Act when it wants to take certain dietary supplements off the market. Today, I'd like to convince the Court of three points, which I can summarize really quickly, all of which focus on the first argument we've made on our brief — in our brief. First, the district court misinterpreted the words constituent and botanical in the amendments to the FDCA known as the Dietary Supplement Health and Education Act. Second, under the proper interpretation of those words, my clients are entitled to prevail, not simply reversal for a trial, but reversal with directions to inter-summary judgment in my client's favor. The third is that from a health perspective, there should be nothing troubling about the first two conclusions that we are asking the Court to draw. When — I think underline a lot of what the agency is arguing here, and it switches in theories, and the district court's interpretation of the statute is a concern that the words constituent and botanical need to be interpreted in a way more narrowly than their text suggests, because otherwise you'll have the situation in which products that are not safe are on the market. But that is not the role that the dietary ingredient definition was designed to play under DSHEA. When the government wants to take certain supplements off the market because the government believes that they are unsafe, the government has a statutory mechanism for doing so. That's found in Section 342F1 of the statute, which is reproduced at the end of our brief. It's not supposed to use the statutory mechanism that it used here. The entire point of DSHEA was to put the burden of proof on the government to establish that dietary supplements are unsafe when it wishes to take them off the market. The agency was able to effectively flip the burden of proof here by trying to categorize DMAA as a non-dietary ingredient and as a food additive, and thus require my clients to prove not only that DMAA is safe, but that it's generally regarded as safe, which is a fairly substantial burden. I think my clients satisfied that burden, at least to the extent that a trial would have been necessary on that. But the Court doesn't need to go there, and the district court shouldn't have gone there either. The only reason why the district court even considered that question was because it construed the words constituent and botanical in a way that their text won't bear, and that doesn't make sense. So that leads me back to the first point I started off with today, which I'll address now. What do you think constituent means? As long as it's present in a botanical? Yes. That's enough? Well, no. I think it needs to be naturally occurring in the botanical, Judge Jordan. But, yes. As long as the word constituent means a part of something else, something that's a part of something else. The word botanical means plant. So a constituent of a botanical is something that naturally occurs in a plant. The words history of extraction and commercially usable quantities do not appear in the statute. The statute simply says that a constituent of a botanical is a dietary ingredient, not a constituent of a botanical that has a history of extraction in usable quantities. Let me see if I understand just how broad your position, the answer you just gave, Judge Jordan, really is. If I understand it, your position is that the term dietary ingredient means any substance contained in flora and any identical substance that's found or manufactured anywhere else. Anything in flora and any identical substance that's manufactured in a lab or found anywhere in the world, for any reason. That's correct, Judge Hinkle, although the caveat I would add is that it needs to be naturally occurring in the flora, but, yes, that's exactly right. Fair enough. And, again, to the extent that there's concern that that definition is broad, I think that's quite consistent with what Congress was trying to achieve in DSHEA. You only need to look at the ingredient that's listed right before constituents of botanicals in Section 321 FF15. There's an incredibly broad definition of things that can be dietary ingredients. Congress wanted to allow dietary supplement manufacturers to include a wealth of items within dietary supplements. It did not want unsafe products in the market, but the way that those products were supposed to be taken off the market was by the government establishing that those products are unsafe. That's not something that could have been done here. But when you look in the dictionary under botanical and it says things like something extracted from a plant used for medical purposes or dietary purposes, you ignored all that. Botanical to you means flora, period. Yes, Judge Hinkle. I think botanical means plant in this context. And if there's a choice between two definitions, the Court, consistent with Congress's purposes under DSHEA, should choose the broader of the definitions. Again, that shouldn't raise any concerns because the safety provisions are always there to ensure that unsafe materials aren't put on the market. I mean, to give an example of how the district court's interpretation doesn't make sense here, if the court were to ask me, well, let me back up a second. The government's definition proffered in its brief of constituent includes the word constituent is synonymous with the word ingredient. So if the court were to ask me to go fetch as quickly as possible an ingredient of a cake, I would try within the 3 minutes and 45 seconds I had left to go sprint to the lawyer's lounge and bring back a bag of sugar from the coffee table over there. And I think I would have complied with the court's request to bring an ingredient of a cake with me, even though that sugar had never actually been extracted from the cake itself. As long as the — everybody acknowledges that sugar is a part of cakes, and the fact that there's no history of people extracting sugar from cakes or that the sugar I brought you had never actually been in a cake would not change the reality that that sugar was part of a cake. So when I look in the dictionary under constituent and it says things like an essential part, essential, just read that out of it. It's just constituent means any part of. Anything found in is a constituent. I understand the word essential is used in the government's definition, which is only one of several definitions that have been proposed. But I understand the word essential to basically mean inherent. So when I say to you the constituent needs to be a naturally occurring part of the natural essential means, but it can't be the case that merely because some geraniums or pelargoniums have DMAA and some do not, that the — that DMAA is not deemed essential. For the geraniums that — for the geraniums that have DMAA, that DMAA is an essential part of those geraniums. The fact that — well, the fact that some humans have hair and some don't, like me, doesn't mean that for the humans who have hair on top of their head, that hair is not essential. Likewise for DMAA here. I wasn't as worried about essential, but I couldn't find anything in the dictionary that made it quite as broad as you suggest, meaning anything included in. I think the word constituent means a natural part of something else, and I think Congress had a very broad view of things in mind. Under the proper interpretation of those words, something that is part of something else, something that's naturally found in geraniums, the evidence here established that DMAA was naturally found in geraniums, or at least that the government had not satisfied its burden of showing that DMAA is not naturally found in geraniums. In considering that question and considering what the right remedy should be here, I think the right place for the Court to start is by looking at the evidence that HITECH put forward in terms of studies that have found DMAA in geraniums. The government brought this litigation on the premise that it was going to disprove those studies, the Fleming study, the Lee study, the Ping study, and that it was going to do so through the studies from the University of Mississippi. But discovery in this case revealed that, in fact, the studies from the University of Mississippi had revealed DMAA in the geraniums that they had studied. I did want to ask you one other thing. You started off by saying that if we agree with you, we should reverse and render. Don't they get to prove it's unsafe? Not in this context, Judge Hinkle. The forfeiture petition here alleged that DMAA is not a dietary ingredient, and that was the ground on which they sought, the government sought forfeiture of over $2 million worth of my client's products. So you think they do not get an opportunity to prove that it's actually unsafe? That if they lose on the dietary ingredient question, they just lose? In this case, that's correct. I mean, they seized these materials on the premise that this was not a dietary ingredient. They did not plead in the alternative that this was unsafe. If they want to prove that DMAA is unsafe, the right way to go is through a rulemaking like the one that the FDA employed with respect to ephedra. I see I'm out of time, and I reserve the remainder of my time. Can I ask one more question? And the reason you say that about the government not being able to go to trial on that second issue, if you prevail on the first statutory question, is because whether or not something is generally accepted as safe is an exception to the bar that the government was traveling on in the first place, essentially, right? That's correct, Your Honor. So if the government's theory of where your client's products because of its ingredients fall in the table, if the government is wrong about that, then you don't have to show an exception to the government's theory in the first place? That's correct. I mean, if the Court disagrees with me on the first point, then at the very least, my clients would like an opportunity to prove the general regard for safety of this product at a trial. But I don't think you need to get there because I think the government hasn't satisfied its burden with respect to dietary ingredients. On that second point, if you lose on the first point, you agree that you don't necessarily win as a matter of law on the second point. On that second point, the remedy you're seeking is a trial. Well, we're seeking that at the very least. I do think there are some substantial problems with Dr. Keefe's testimony in terms of its reliance on case studies or case reports as opposed to genuine studies here. But, yes, at the very least, I think that there's a battle of the experts here in terms of whether they view this product as generally regarded as safe. Thank you. Mr. Aguilar. Good morning, and may it please the Court, Daniel Aguilar for the United States. This case turns on the two questions that we've identified first, whether the chemical DMAA is a dietary ingredient because it's a constituent of a botanical. Would you pull the mic a little closer? Oh, I'm sorry, Your Honor. First, whether DMAA is a dietary ingredient because it's a constituent of botanical or whether it's a food additive. And then second, if it's a food additive, whether it's generally recognized as safe by qualified scientific experts. Mr. Aguilar, before you finish your 15 minutes, I'd like you to address one issue. You can do it whenever you'd like. My concern in this case is that the district court rejected your initial theory of forfeiture, right? No, I wouldn't agree on that, but I can continue with the rest of your question and explain our disagreement. You said your theory was unfounded as presented factually, right? No, I wouldn't agree with that if I could explain just on that issue. This was cross motions for summary judgment, right? Yes. And so we argue that no reasonable finder of fact could agree that DMAA existed in geraniums. The Court said — Because of a theory that you presented, and the district court rejected that theory. No. What the district court said was it would be inclined to find that the United States had not met its burden for its own summary judgment motion. But if the United States — if it was inclined to find that the United States wasn't entitled to summary judgment, that doesn't necessarily entitle high-tech to summary judgment. You could think that a reasonable finder of fact might disagree, and at that point, the resolution would be a jury trial rather than a summary judgment order for high-tech. Okay. But you're not defending your initial theory of forfeiture on appeal. We are. So we contest whether or not — You're defending the district court's ultimate theory. Yes, because on the grounds that the district court held, we win. Okay. We disagree with whether DMAA exists in geraniums, as we pointed out in our opening brief with the evidence that we presented there on contamination, methodological flaws, and the lack of a biologically plausible mechanism for producing DMAA. Okay. So my question is, and you can address it whenever you'd like during your 15 — your remaining time, is this. However you view it, the district court adopted an interpretation that you had not proposed. Am I right so far? That's correct. Okay. And that interpretation was not purely legal. It was based on facts in the record as well, in terms of whether to grant summary judgment or not, right? Because the district court said there had to be a history of extraction and usable quantities, right? Yes. You had not proposed that standard. Correct. Our standard was that it didn't exist at all. Correct. So you had not proposed that standard. That is evidentiary. In order to show a history of anything, you need to do discovery. You have to show whether something happened in the past or didn't happen in the past. If the district court came up with this interpretation of the statutory framework without your assistance and without you proposing it, why wasn't HITECH entitled to at least some limited discovery to determine or make an argument as best as it could that there had been a history of commercial extraction? In other words, if that issue had never been teed up by either side during the entire case and its summary judgment, why wasn't HITECH entitled to an opportunity to prove its case under the district court's theory? Sure. I'm happy to address this right now. So we address this argument at pages 29 to 31 of our answering brief. Let me distill what our argument is here. And I think it's correct, is that if the district court doesn't provide notice on a particular ground that is going to render summary judgment, the appellant still has to show that that is prejudicial. It's subject to harmful error analysis. That's the Fifth Circuit's decision in the Spring Street Partners case. So what HITECH has claimed in both its opening and reply brief is it was prejudiced because there were two particular pieces of evidence that it did not develop, but that it would have developed if it had known about that. Those two pieces of evidence, the only ones that it points to, are patent applications that claim to be able to produce a solution from geraniums that is 3 percent DMAA. That would have proven, absent of massive methodological or contamination concern, that DMAA existed in geraniums at 300 million parts per billion. What HITECH stipulated to in or HITECH agreed to in the uncontested statements of fact of summary judgment was that the highest levels DMAA had been shown at in all of its other evidence was 365 parts per billion. The party's evidentiary dispute was, did DMAA exist at all in geraniums? HITECH's best evidence was that it existed at 365 parts per billion. Well, best evidence without discovery. But, and so going to this point. You can't ask a party to show prejudice due to lack of discovery without giving them discovery. But they had discovery on this, Your Honor. No, they did not. You did not tee up the issue.  a legal theory on which the government can forfeit goods. Is that correct? Yes. And if you tee up a certain theory, if you say these goods are forfeitable for reason X, that's the only reason that the claimant has to fight. It doesn't have to fight other things in the either that it doesn't know about. But here's the thing, Your Honor. If the district, let me flip this question for you. Make it a little more difficult for you. If the district court had come up with a legal theory, statutory interpretation that HITECH had not advanced and had said, I'm coming up with theory number three and granted summary judgment against you, would you have appealed? I mean, obviously that's a deliberative process set up to the Solicitor General, but I'll assume that we would appeal that. I mean it in a practical sense. I'm not asking you to give me any state secrets. Sure. I'm just saying here that we would have appealed. But we would have also agreed that we would have had to show error. You would have been incensed that a district court in an adversary system would have come up with a legal theory that neither side had advocated and not giving you a chance to develop it, respond to it, or do anything else. You would have been up here in a heartbeat. You don't have to respond. Your Honor, the particular evidence that we were talking about here, the two It presented them at depositions. It asked the government's expert about them. How do you know that it would not have developed more evidence once it knew that that was one of the critical issues? Because if they could have asked anything about this patent application, if it could have verified it at all, I don't know of any evidence that we could have produced in response to say that DMAA isn't in geraniums. It would have been there at 3%, 30 million parts per billion. That would have been essentially conclusive in this case about whether it existed in geraniums at all. They had every incentive to develop that evidence. And they claimed that this was only evidence that they now knew that they had to rely on after never relying on it in any of their summary judgment papers. I don't want to derail you from the rest of your argument, so thank you very much for answering the question. On this first question, the district court's interpretation here is correct. It's correct because if you look at what Congress was concerned about at the time it enacted these amendments to the Food, Drug, and Cosmetic Act, there were a series of cases in the early 90s when the United States was taking enforcement actions against products such as oil from black currant berries. That's the Seventh Circuit case, or evening primrose oil, oil from a flower. And in the Senate report to these amendments, the Congress stated that what it was concerned about was products like ginger, garlic, pine bark extract, caffeine, which is produced in plants. And it was concerned that these products that are obtained from plants and physically derived from them should be treated as a new category, a dietary ingredient for use in dietary supplements. And the list of words that Congress used in this statute, concentrate, metabolite, extract, combination, and constituent, are methods of physically deriving something from a plant and preparing it for that use in a dietary supplement. So the statutory words here, and the applicable canon is the associated words canon, nosoterososis, where you take a word's potentially extremely broad meaning and you narrow that to the meaning that it shares with the words in the same list. And so the late Justice Scalia and Brandon Garner explained this in their book Reading Law, and they cited a particular case called State v. Taylor that discussed a case that could literally be any type of container. But in the particular statute, it talked about if you have a gun in a car, that's illegal unless it's in a gun box, a case, or a securely tied package. So there you take a word case with a relatively broad meaning and you narrow its meaning based on the words that it's in. And you don't always use that canon. You, but you use the canon when the words appear in a list where every other word shares a common meaning. And so here — But sometimes all the words in a list don't share a common meaning. Right. And so — Constituent isn't necessarily the same as the others you've mentioned. And so this is what the canon is used for. When you have a particular contested word and the parties disagree about its meaning, you look to every other word in the list. And you admit that that one we're not sure about. Let's look to all of the other ones. In here, concentrate, orange juice concentrate, concentrating, metabolite, something that's been metabolized within the plant. An extract — Metabolite has to be extract, commercially extracted? Well, a metabolite is usually something in a plant that's been brought about by the plant's metabolic processes. So like caffeine is an example. A plant will produce caffeine as part of its metabolism. But again, my question is, commercially extracted? That's usually how it's done, yes. So — But it has to be done? Yes, because if I can explain on this point, all these other words and all the history of these dietary supplements are things that have been physically extracted from plants and obtained by them. That's what — that's where the concern is. What's new and what's the edge case — it's not even the edge case, it's kind of just a different category of cases — is something that's merely been we read the Fleming and Lee studies as they take a solution of geraniums, they vaporize it into a gas, and then they look at the gas to determine what chemicals are in there. You can't use that gas for any product. You can't put that in a pill. It's never been obtained from the plant. And so all of these words go to show that it's never been obtained. There's no evidence to that. The only evidence that they claim on this point was the patent applications, which, as we explained, we think they had every incentive to develop earlier. I understand what you're saying, and it's got a certain intuitive appeal to say something that's in such a small amount and it's not practical to do it. I understand all that. I'm going to ask you about this notion that it has to have been done, that the history of it is somehow the controlling factor. And I ask hypotheticals. The first response is always it's a bad hypothetical or it couldn't understand that response. But here's the question. So you've got a tree, a truffula tree, and it's 50% ABC magic dust. But nobody has ever harvested the magic dust and made a dietary ingredient out of it. Somebody comes along in the laboratory and makes a supplement with ABC magic dust, but it's never been taken out of the truffula tree. Why isn't that a dietary ingredient? Well, I think what the statute contemplates previously in it is, before we get to the other words in subsection F, is previously it says you can just use the plant itself, the herb or other botanicals. So if something was present in such those high quantities, I would think that there would be a way that you could just use the plant itself or part of the plant. Could, but never had been done. But stipulating — And I can't find that in the statute, and I don't know why in my hypothetical that would be the test. So I would think that it's the way that Section 321, both the term where it's defining food additive in S6 on what's not a food additive and FF1 go to this. FF1 says you are a dietary ingredient if you're used or intended to be used in a dietary supplement. And for food additives, it says food additives are not an ingredient that's in or intended for use in a dietary supplement. So I think there it's talking about a process where you're actually going to put this in something to sell. And so then reading all of the other words, the concentrate, the metabolite, the constituent, those are all processes where you are obtaining it from the plant. And so I think we're not reading anything into the statute. We're reading it as a whole to understand how these terms apply here. And that's why the physically obtained at a minimum once makes sense in the statutory scheme. So in my hypothetical, the ABC magic dust, it is a dietary ingredient? Correct. Because it's never been obtained from that plant. Now, that doesn't preclude the fact that technologically in the future, if someone was able to do that and actually derive it for use in a dietary supplement, that would then be fine. It would be a constituent of a botanical or an extractor. So if you're first in time, you're out of luck? No. If you're first in time and you've actually done this and then put this in your product, that's fine. There's the history now of putting it in the dietary supplement. I thought that was your example. My example was they didn't take it out of the tree, but they did it in a lab. Oh, in a lab. Okay. Got it. Got it. And on the issue of whether or not this is generally recognized as safe, I point the court to the fact that high-tech's own two experts agreed that there isn't sufficient information on the magnitude of association between consuming DMAA and adverse medical events and the fact that some people are predisposed to severe health consequences based on consuming DMAA. That's in our reply brief or our answering brief. If I could ask one more. I did want to ask you this question about reversing and rendering. If we disagreed with you on the legal question about what this means, I had come in thinking you would be entitled to a remand to prove that it was actually unsafe. Mr. Nyman tells me that's not so. I wanted to get your position on that. I think at a minimum, if you disagreed with us on the threshold legal issue, we would be entitled to a remand to, at a minimum, litigate the issue of whether or not DMAA is even present in geraniums because, as we noted, the district court never made an explicit holding on there. And then I guess the subsidiary question would be then, is it unsafe? I believe that's provided for in Section 342 F2, I think is the one where it says some dietary ingredients can still be adulterated or they can pose a serious risk to health. In that case, there's still a seizure action available. His response wasn't that the statute wouldn't allow it but that you hadn't pleaded it. That's correct. We didn't plead that in our amended complaint because we argued that it was an unsafe food additive. Why isn't that the end of the issue then? Well, I think because the – You're the party going forward. So, again, on the threshold – If you lose. Right. If you lose on that first question. Sure. So, I guess on the very first question, again, we'd be entitled to a remand based on the issue of whether it's present in geraniums at all. And I think I would need to think about this a little bit more. Maybe there's an issue about whether or not we would be entitled to an amended complaint, but I haven't studied this thoroughly, so I don't want to commit to a particular answer because I'm just unsure of it at this time. Thank you. Thank you. May it please the Court. First, in response to the questions that Judge Jordan was asking Mr. Aguilar, my client certainly was prejudiced by a lot of things in this case, and one of them was the district court's imposition of the interpretation of the statute that even the government had not proffered here. The government says it was inconsequential because we – there was this evidence of patents in the record. But by the time that we had gotten to the point where the parties could have followed up on that patent evidence, there was no need to do so. By that point, discovery had revealed that the various studies from the University of Mississippi and the University of Texas that the government had premised this entire forfeiture on had, in fact, revealed DMAA in the geraniums. There was simply no need for my client to follow up on the patents at that point in time. But didn't you have every incentive? I mean, you didn't know you were going to win at that point. Didn't you have every incentive to find and present all of the evidence you could on whether this product had ever actually been derived from a plant and in what quantity? You found the patents, and if, in fact, they had manufactured the product based on the patents, wouldn't you have been the very first one to find it and present that evidence? Well, I can't speculate on that, Judge Hinkle. Certainly, my client had every incentive to supply as much evidence as they possibly could supporting their theory of the case here. But as the district court found below, they had, in fact, done so. All of the studies that the government had relied on turned out to be flawed and had revealed DMAA in the plants. But if we sent the case back, on the theory that Judge Jordan's questions asked, we send the case back and say, have some discovery to prove that this has ever been done, don't you think a year from now we're going to be in exactly the same place we are now? I mean, if there was evidence that this had ever been done, you'd have already found it, wouldn't you? Well, I can't speculate on the answer to that question. I feel quite certain that my client would at the very least want an opportunity to pursue that theory and to defend itself against this interpretation of the statute that the district court adopted. That said, I don't think the court needs to go that way, in that direction. And that's why I've asked the court to remand with instructions to grant my client's summary judgment motion. All of the evidence below showed that DMAA is, in fact, in geraniums. The government had not satisfied its burden of establishing that DMAA is not naturally produced in geraniums. So I don't even think a remand is necessary, but at a minimum that would be required. Judge Hinkle, you had asked some questions about the definition of constituent. But if you look at the government's own definition of constituent, it is very broad. It says a constituent is a part of a complex whole. And it refers to the constituents of a chemical compound. So in other words, hydrogen and oxygen would be constituents of water under the government's theory. Under that theory, DMAA is well within the constituents of a botanical in light of the evidence that was in front of the district court. I understand my colleague, Mr. Aguilar, to have conceded that caffeine is a constituent of a botanical, and rightly so. But it occupies the same place within certain plants that DMAA occupies within geraniums, according to the only evidence that was in front of the district court in this case. Mr. Aguilar says, even if we agree with you on the definition that the government's entitled to a trial on whether DMAA is actually in geraniums, and they've got testimony that there's no way that a geranium could do this, and that fertilizer might be the source of this, finally right. They would at least be entitled to a trial, wouldn't they? No. I disagree with that assessment of the evidence, Judge Hinkle, and here's why. That evidence is based solely on the declaration of Dr. Paula Brown from the University of British Columbia. In her testimony, she does not say that it's impossible for geraniums to make DMAA. She says that there is no known biological pathway by which plants could make DMAA. But the evidence is that the — And there is evidence that this is in fertilizer and that that could be the source of DMAA in a geranium. I disagree with that assessment of the evidence as well, Judge Hinkle, and here's why. The expert who said that there was DMAA in certain fertilizers was Dr. Simone, one of HITECH's own experts. And if you look, I believe it's document 97-3 or 98-3. It's a second declaration of Dr. Simone. Dr. Simone says the amount of DMAA that is in fertilizer could not possibly explain the amount of DMAA that his study, the Fleming study, found in the plants. So the government — Is he the only source of the information that this is in fertilizer? I'm not sure about the answer to that question. He is — he's certainly the evidence that has been cited by both — the testimony that has been cited by both parties. But at the end of the day, the government has it — the government has the burden of proof here. It's always had the burden of proof, and it needed to establish, if its theory is that fertilizer is causing the DMAA to be in the geraniums, it needed to establish that in this forfeiture proceeding where it seized $2 million of my products. But isn't the — but going back to Judge Hinkle's question, isn't the government's experts' declaration or depositions viewed in the light most favorable to them enough to create an issue of fact? You're at summary judgment. You're not at a trial. No, that's — it's certainly the case, Judge Jordan, that we're at summary judgment, and they're entitled to have every inference drawn in their favor — On your motion. — in the context of our summary judgment motion. Correct. But I don't think that drawing every inference in favor of the government here gets them to the point where they can get past summary judgment. Again, they have the burden of proof. This is a forfeiture proceeding. They're seizing my client's property. We understand the government has the burden of proof. The point of the matter is both sides told the court that this case is ready for summary judgment. Both sides. That's correct, Judge Jordan. And so is your disagreement. So we have a duty to weigh the — to take the evidence in the light of the nonmoving most favorably on both ways. But that has nothing to do with the government's burden of proof in the first place. Well, I think it does to the extent that — The government has the burden of proof because they brought the case. That's correct. And now we're talking about what does this statute mean? What do these words mean? Correct. But I think in assessing whether the government has put forward evidence that DMA is not a constituent of a botanical — We understand your point. Okay. Okay. Thank you, Your Honor. All right.